J-A21042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 779 EDA 2021 |

Appeal from the Order Entered April 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001100-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: H.T.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 780 EDA 2021 |

Appeal from the Decree Entered April 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000270-2020

BEFORE:   KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED NOVEMBER 19, 2021**

Appellant, L.L. ("Mother"), files these consolidated appeals from the decree dated and entered April 1, 2021, in the Philadelphia County Court of Common Pleas, granting the petition of the Philadelphia County Department of Human Services ("DHS") and involuntarily terminating her parental rights

_____

[*] Former Justice specially assigned to the Superior Court.

to her minor, dependent daughter, H.H. a/k/a H.T.H., born in January 2016 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]

Mother further appeals from the order dated and entered April 1, 2021, changing the Child's permanent placement goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351. Lastly, on July 18, 2021, counsel for Mother, Gary S. Server, Esquire ("Counsel"), filed a petition to withdraw, as well as an **Anders**[2] brief, averring the appeals are frivolous. After review, we grant Counsel's petition to withdraw, and affirm the trial court's decree and order.

The family at the center of this matter was known to DHS for many years prior to Child's birth with Mother's parental rights to several older children being previously terminated. Most recently, on December 15, 2016, DHS received a GPS report that Child was abandoned with a paternal cousin, N.P. N.T., 2/11/21, at 16; **see also** DHS Exhibit 1. The court adjudicated Child dependent on January 4, 2017. Order of Adjudication and Disposition-Child Dependent, 1/4/17. After adjudicating Child dependent, the court

---

[1] By separate decrees also dated and entered April 1, 2021, the trial court likewise involuntarily terminated the parental rights of Child's father, D.H. ("Father"), as well as Unknown Father. Neither Father nor any unknown father filed a separate appeal, and neither is a participating party in the instant appeals.

[2] **Anders v. California**, 386 U.S. 738 (1967).

eventually reunified Child with Mother a year later on December 20, 2017. *Id.* at 16; Recommendation-Permanency Review, 12/20/17.

Thereafter, subsequent to Mother leaving an in-patient treatment program against advice with Child,[3] another GPS report was received on January 3, 2019. Again, Child was found with the same paternal cousin.[4] *Id.* at 16-17, 41-42; *see also* DHS Exhibit 2. On March 6, 2019, the court found that Mother had abandoned Child and her whereabouts were unknown. DHS supervision was discharged, and Child was committed to DHS retroactive to January 3, 2019. Recommendation-Permanency Review (Non-Placement), 3/6/19. Child remained placed with her paternal cousin in kinship care.[5] *See id.*; *see also* Recommendation-Permanency Review, 6/5/19; *see also* N.T., 2/11/21, at 25.

The court conducted regular permanency review hearings at which it found Mother non-compliant. Throughout these proceedings, the court continued to maintain Child's commitment and placement. Permanency review Order, 9/29/20; Permanency Review Order, 1/8/20; Recommendation-

---

[3] Mother and Child were deemed AWOL ("absent without leave") as of April 26, 2018. Recommendation-Permanency Review (Non-Placement), 7/17/18.

[4] Mother explained that she left Child with a paternal cousin due to a lack of stable housing after getting in an altercation with a family member with whom she was staying. Mother asserted that, despite allegations made to DHS that she could not be found, she remained in contact with paternal cousin and saw Child. N.T., 4/1/21, at 41-42.

[5] Given this relationship, from this point forward, we refer to Child's paternal cousin with whom she remained placed as foster mother.

Permanency Review, 10/23/19; Recommendation-Permanency Review, 6/5/19; **see also** N.T., 2/11/21, at 25, 27. Significantly, Mother moved to California in February 2020. N.T., 4/1/21, at 18-19, 26, 28.[6]

DHS filed petitions for the termination of parental rights and goal change on August 7, 2020.[7] The court held a hearing on February 11, 2021.[8] Neither Mother nor Father was present, but each was represented by counsel. DHS presented the testimony of Community Umbrella Agency ("CUA"), Turning Points for Children, Case Manager, Joseph Sargent. DHS further presented DHS Exhibits 1 through 10, which were marked and admitted without objection. N.T., 2/11/21, at 13-14; **see also** N.T., 4/1/21, at 54-55. Child was represented by a guardian *ad litem* ("GAL"), Athena Dooley, Esquire. At the conclusion of the hearing, the court closed the record and re-listed the matter to ascertain whether there was a conflict between Child's legal interests and best interests and whether counsel could therefore represent both.[9] **Id.** at 35-36, 41-42.

_____

[6] Mother subsequently returned to Philadelphia in February 2021. N.T., 4/1/21, at 22.

[7] While originally filed on March 13, 2020, due to an omission, the petitions were re-filed on August 7, 2020. N.T., 4/1/21, at 55; N.T., 2/11/21, at 7.

[8] This hearing was conducted telephonically due to the COVID-19 pandemic. N.T., 2/11/21, at 2.

[9] In connection thereto, the court instructed the GAL "to ascertain whether the child is competent enough to be able to state her wishes and knows the difference between reunification and adoption." N.T., 2/11/21, at 36.

At the next listing on April 1, 2021, Mother was present and the court re-opened the record.[10] Mother testified on her behalf. DHS again presented the testimony of Joseph Sargent, as well as Child's foster mother, N.P. The GAL presented the testimony of social worker, Roya Paller, who met virtually with Child to assess Child's competence and desires.[11] At the close of the hearing, the court announced its decision to terminate Mother's parental rights and change Child's goal to adoption. N.T., 4/1/21, at 58.

Memorializing its determination placed on the record, by decree dated and entered April 1, 2021, the court terminated Mother's parental rights. Further, by order also dated and entered April 1, 2021, the court changed Child's permanent placement goal to adoption. Thereafter, on April 15, 2021, Mother, through appointed counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P.

---

[10] This hearing was conducted virtually due to the COVID-19 pandemic. Mother was, however, physically present in the courtroom. N.T., 4/1/21, at 1, 12.

[11] Ms. Paller's report was marked and admitted as Ms. Dooley Legal Counsel Report 1. N.T., 4/1/21, at 55-56. While the copy of this exhibit contained in the certified record is not marked or identified as such, it is nonetheless included in the certified record. Ms. Paller acknowledged a lack of understanding and explained that for those Child's age she breaks down the concepts of adoption and reunification "into a younger version" referencing the concept of "forever homes." *Id.* at 56-57. The court found no conflict between Child's legal and best interests. Trial Court Opinion, ("T.C.O."), 5/14/21, at 28.

1925(a)(2)(i) and (b). This Court *sua sponte* consolidated Mother's appeals on June 9, 2021.[12, 13]

When counsel files an **Anders** brief, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw. **Commonwealth v. Washington**, 63 A.3d 797, 800 (Pa.Super. 2013); **see also Commonwealth v. Rojas**, 874 A.2d 638, 639 (Pa.Super. 2005) (stating, "When faced with a purported **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw[]") (citation omitted). In **In re V.E.**, 611 A.2d 1267 (Pa.Super. 1992), this Court extended the **Anders** principles to appeals involving the termination of parental rights. **Id.** at 1275.

Counsel appointed to represent an indigent parent on appeal from a decree involuntarily terminating parental rights may therefore petition this Court for leave to withdraw representation and submit an **Anders** brief. **In re S.M.B.**, 856 A.2d 1235, 1237 (Pa.Super. 2004). In **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009), our Supreme Court explained, "the major thrust of **Anders** . . . is to assure that counsel undertakes a careful

---

[12] Mother filed an application for consolidation on June 8, 2021, which this Court denied as moot on June 14, 2021, given its prior order as to consolidation. Per Curiam Order, 6/14/21.

[13] After remanding this matter on July 15, 2021 for a determination as to whether counsel for Mother abandoned her due to failure to file a brief, on July 20, 2021, this Court vacated said order after counsel's late filing of a brief. Per Curiam order, 7/20/21.

assessment of any available claim that an indigent appellant might have." *Id.* at 174, 358. The Court stated that this "is achieved by requiring counsel to conduct an exhaustive examination of the record and by also placing the responsibility on the reviewing court to make an independent determination of the merits of the appeal." *Id.*

> To withdraw, counsel must:
>
> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa.Super. 2009)); *see also Commonwealth v. Orellana*, 86 A.3d 877, 880 (Pa.Super. 2014); *Commonwealth v. Millisock*, 873 A.2d 748, 751 (Pa.Super. 2005). Counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Millisock*, 873 A.2d at 752.

We further review Counsel's *Anders* brief for compliance with the requirements set forth in *Santiago*, *supra*.

> [W]e hold that in the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling

case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

978 A.2d at 361. "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Commonwealth v. Goodwin*, 928 A.2d 287, 291 (Pa.Super. 2007) (*en banc*) (quoting *Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa.Super. 2004)).

Counsel has satisfied the first requirement of *Anders* by filing a petition to withdraw. Counsel asserts that he has made a conscientious review of the record and determined the appeal would be frivolous. Likewise, Counsel has satisfied the second requirement by filing an *Anders* brief that complies with the requirements set forth in *Santiago*, *supra*. With respect to the third requirement, Counsel attached to his petition a copy of a letter advising Appellant of his rights pursuant to *Millisock*, *supra*. Hence, we conclude that Counsel has complied with the procedural *Anders* requirements and proceed to a review of the merits.

Counsel's *Anders* brief raises the following issue for our review: "Whether the trial court committed reversible error when it changed the goal to adoption and involuntarily terminated [M]other's parental rights under 23 [Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b)] where such determinations were not supported by clear and convincing evidence?" *Anders* Brief at 6.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

- 8 -

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

- 9 -

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d at 384. Here, we analyze the court's termination decree pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity,

> abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (quoting *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (internal citation

omitted)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (quoting *In re N.A.M.*, 33 A.3d 95, 100 (Pa.Super. 2011)). As such, "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re S.C.*, *supra* at 1105 (quoting *In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010)).

Instantly, in finding grounds for termination of Mother's parental rights pursuant to subsection (a)(2), the trial court reasoned:

> Child has been involved with DHS since she was abandoned with Paternal Great-Cousin in December 2016. While Mother was reunified with Child in December 2017, Child was removed from Mother's care again after she abandoned the Child with Paternal Great-Cousin a second time.
>
> Mother's SCP [("Single Case Plan")] objectives throughout the life of the case were to: comply with a BHS [("Behavioral Health Services")] assessment; engage in mental health treatment and therapy through JJPI [("Joseph J. Peters Institute")]; make her whereabouts known and avail herself to CUA; engage with ARC [("Achieving Reunification Center")] for housing, employment, and parenting programming; obtain, keep, and provide proof of employment; attend CEU [("Clinical Evaluation Unit")] for assessment, screening, and monitoring; and attend visitation with Child. Mother was aware of her objectives, as the CUA Case Manager provided the information orally, through mail, and electronically through a PDF. Mother also testified to speaking with CUA in February 2020. Even after [] Child came into DHS care a second time, Mother's objectives remained substantially the same throughout the life of the case. The CUA Case Manager testified that he had no knowledge of Mother completing a single objective.

Mother did not attend a BHS assessment. Since Child came into care a second time, the CUA Case Manager testified that Mother did not engage in any mental health treatment or therapy. Mother testified that she had engaged in treatment at JJPI and successfully completed her mental health objective there[] but did not provide a certificate of completion or other documentation to CUA. Mother claimed that she provided CUA with documentation of her weekly visits; however, CUA testified to having no knowledge of any objectives complet[ed].

Mother also did not avail for a CEU assessment, nor did she engage in any other drug or alcohol program. Mother testified to completing drug and alcohol treatment at Interim. Interim was a mother/baby program that offered a dual diagnosis treatment to Mother. Mother left the mother/baby program early against medical advice and her whereabouts became unknown, and so treatment at Interim was never successfully completed. Mother was discharged from her Interim dual diagnosis program. Mother was also recommended for an outpatient dual diagnosis program. Mother admitted that she never followed through with any outpatient dual diagnosis program, either in Philadelphia or California. Mother did not provide a certificate of completion from Interim to CUA.

Mother had referrals to ARC for parenting, employment, and housing programming, but Mother did not complete any of these objectives through ARC nor an alternative program while in California. The CUA Case Manager had no records of Mother engaging with these objectives at all. Since [] Child has come back into care a second time, Mother has not completed any of her SCP objectives. Mother testified to completing a sixteen-week parenting class and an additional six-week class, prior to [] Child being reunified with her the first time. Mother did not provide documentation to support this assertion after [] Child came back into care a second time.

The CUA Case Manager spoke with Mother three days prior to the February 2021 hearing and testified that she was not employed at that time. Mother testified that she was working at a Cheesecake Factory in Santa Monica, California, then later testified that she was working at a bakery in a Philadelphia-area Acme. Mother provided no documentation to support either employment.

Mother also did not engage in visitation. Mother had not seen her children since May 2019 and had made no outreach to CUA to

- 13 -

request or schedule visitation. Mother was offered virtual visits when the COVID-19 pandemic began, but she did not avail herself for virtual visits either. Mother never graduated past supervised visitation. Along with failure to engage with visitation, Mother did not make any other outreach attempts like sending letters or gifts to Child. The CUA Case Manager described Mother as "chronically absent from the children's lives" and stated that "[Child] basically doesn't know who she is." [] Child's foster parent confirmed that the last time she heard from Mother was in 2019.

The CUA Case Manager also testified that it was impossible for him to know if Mother had stable housing, as Mother had moved to California in February 2020. Mother did not indicate to the CUA Case Manager why she had moved to California. Mother also did not indicate to CUA that she was attempting to complete any of her objectives in California.

Since Child's re-commitment to DHS, Mother has been minimally compliant with her SCP objectives. Mother has failed to successfully complete any of her SCP objectives[.] The conditions and causes of Mother's incapacity cannot or will not be remedied by Mother. Child was adjudicated dependent on January 4, 2017. Child was reunified with Mother on December 20, 2017. Child was later re-committed to DHS after abandonment on March 6, 2019, retroactive to January 3, 2019. Mother was reunified for Child for approximately one year[] and abandoned Child again with Paternal Great-Cousin after approximately eleven months of reunification. Mother was inconsistent in her attendance at court hearings and is aware of her SCP objectives. Mother had ample opportunity to put herself in a position to adequately parent and care for Child, but her repeated and continued incapacity has not been mitigated. Mother has abandoned Child multiple times and has displayed an inability or unwillingness to remedy the causes of her incapacity. Mother is unable to meet Child's basic needs. The testimony of the CUA Case Manager was credible. Mother has demonstrated an unwillingness to acknowledge or remedy the causes of her incapacity to parent in order to provide Child with the essential parental care, control, or subsistence necessary for her physical and mental well-being. Termination under [23 Pa.C.S.A. § 2511(a)(2)] was proper.

T.C.O., 5/14/21, at 18-21 (citations to record omitted).

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that Mother failed to complete her goals aimed at reunification. N.T., 2/11/21, at 19-24. CUA case manager Joseph Sargent testified that he and Mother spoke regarding her objectives, which were as reflected above by the trial court, and that Mother was aware of same. *Id.* at 18-19 ("Mother reached out to our CUA in late March early April of 2020. . . . I informed Mom of her objectives and who I was to the case. I also made sure Mom gave me an updated address[ a]nd we mailed out her single case plan to her via the address that we got. I also, being proactive, I also sent her a copy of the single case plan via text message[ b]ecause she was able to receive a PDF through a text message.").[14]

Mr. Sargent confirmed that Mother's objectives remained substantially the same throughout the case and that he had no knowledge of her completion

---

[14] Contrary to Mother's representation, when asked if he was in contact with Mother consistently since assigned to the case in 2020, Mr. Sargent responded, "Not consistently, no." N.T., 4/1/21, at 32, 37-38, 49. He reported numerous attempts to contact Mother via mail, as well as telephone. N.T., 4/1/21, at 50-51. While Mother denied receipt of correspondence from him, Mr. Sargent indicated that correspondence forwarded via regular mail was not received back or returned with a notation of return to sender. *Id.* at 20-21, 29, 37, 50. Mr. Sargent further testified that, regardless of any suggestion to the contrary, he was never nonresponsive to any outreach from Mother. *Id.* at 19, 51.

of any of her objectives.[15, 16]  *Id.* at 19.  When asked as to a resulting opposition to reunification, Mr. Sargent explained, "Mom has been consistently absent during this case.  She always shows up around [c]ourt time.  She hasn't followed any of her objectives.  She hasn't done any of her objectives."  *Id.* at 24.  Notably, Mr. Sargent further expressed concerns regarding drugs and alcohol and mental health due to Mother's lack of compliance.  *Id.* at 22.

As such, we discern no abuse of discretion.  Upon review, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being.  *See In re Adoption of M.E.P.*, 825 A.2d at 1272.  Moreover, Mother cannot or will not remedy this situation.  *See id.*  We are mindful of our standard of review set forth above, and reiterated in *S.P.*, and, most recently, in *In re S.K.L.R.*, ___ Pa.___, 256 A.3d 1108, 1127, 1129 (2021), and that we must not substitute our judgment for that of the orphans' court.  As we discern no abuse of discretion, we do not disturb the trial court's findings.

---

[15] Mother claimed completion of her objectives prior to moving to California in February 2020 with documentation provided to CUA, the court, and/or her counsel.  N.T., 4/1/21, at 26, 30-32, 38-41.  Although she indicated attempts to secure such documentation upon her return to Philadelphia, she noted many of the facilities were currently closed to the public.  *Id.* at 32.

[16] In response to inquiry from the guardian *ad litem*, Mr. Sargent stated that Mother did not indicate attempt to complete any of her objectives while in California.  N.T., 2/11/21, at 35.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.  The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."  *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

We next determine whether termination was proper under Section 2511(b).  As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012).  In *In re E.M.* [*a/k/a E.W.C. & L.M. a/k/a L.C., Jr.*], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  *In re K.M.*, 53 A.3d at 791.  However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.  "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.  The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."  *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In determining that termination of Mother's parental rights favors Child's needs and welfare under Section 2511(b), the trial court stated:

Mother has been, at most, minimally compliant with visitation since Child's re-commitment to DHS in January 2019. Mother never graduated beyond supervised visitation with Child. Mother has not seen Child since May 2019, nor has she made any outreach to CUA to request or schedule visitation since then. Mother['s] visits had been decreased to monthly due to noncompliance and not visiting with Child. Mother was offered virtual visits when the COVID-19 pandemic began, but she did not avail herself for any virtual visits. Mother claimed she had unsupervised contact with Child against court order, but the Child's foster parent, Paternal Great-Cousin, testified that this never occurred. The foster parent last heard from Mother in 2019. Along with failure to engage with visitation, Mother did not make any other outreach attempts like sending letters or gifts to Child. The CUA Case Manager described Mother as "chronically absent

- 18 -

from the children's lives" and stated that "[Child] basically doesn't know who she is."  Child looks to Paternal Great-Cousin to have her needs met and for comfort.  Child is "very very much attached" to Paternal Great-Cousin, refers to Paternal Great-Cousin as "mommy" and identified Paternal Great-Cousin as her mother to a social worker.  When asked where she wanted her forever home to be, Child stated she "wanted to be with her mommy" and pointed to Paternal Great-Cousin.  The social worker testified that due to Child's age of five years old and Mother not visiting with Child since May 2019, Child does not have a concept of who her birth mother is and only refers to Paternal Great-Cousin as a parental figure.  The CUA Case Manager testified that Child does not have a relationship with Mother.  When he showed Child a picture of Mother, Child did not know who Mother was and did not recognize her image.  The CUA Case Manager testified that Child and Paternal Great-Cousin have a parent-child bond.  He further testified that no irreparable harm would be done by terminating Mother's parental rights because Child is not aware of who her biological mother is and knows only Paternal Great-Cousin as her parent.  The trial court found there is no parental bond between Mother and Child.  Child has been in care for forty-months total, with twenty-eight months in continuous care since her second abandonment by Mother. Because there is no apparent or beneficial bond to preserve, it is in Child's best interest to terminate Mother's parental rights and so be freed for adoption. Due to Mother's noncompliance and lack of participation in supervised visits, Mother has not created a parental bond with Child.  The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship between Mother and Child. . . .  The trial court's termination of Mother's parental rights to Child under [23 Pa.C.S.A. § 2511(b)] was proper and there was no error of law.

T.C.O., 5/14/21, at 26-28 (citations to record omitted).

As to Section 2511(b), upon review, we likewise discern no abuse of discretion.  The record supports the finding that Child's developmental, physical and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b).  *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

CUA case worker Joseph Sargent testified that Child had not had any contact with Mother since May 2019.[17] N.T., 2/11/21, at 24. He therefore indicated that Child does not have a relationship with Mother, stating that "she basically doesn't know who she is."[18] *Id.* at 25. Instead, Mr. Sargent reported that Child shares a parent-child bond with her foster mother, who takes care of her daily needs. *Id.* at 26-27. He observed, "[They] have a parent[-]child bond. They are close. That's who she looks up to for everything." *Id.* at 26. This was confirmed by social worker, Roya Paller, who observed, "[Child] is very very attached to her foster mother." N.T., 4/1/21, at 53; *see also* Ms. Dooley Legal Counsel Report 1, at 2 ("[Child] displays both verbal and nonverbal signs of attachment and bonding with [her foster mother].").

In support thereof, Ms. Paller indicated that Child identified her foster mother, whom she called "Mommy," as her mother. *Id.*; *see also* Ms. Dooley Legal Counsel Report 1, at 2. Ms. Paller likewise testified that Child recognized

_____

[17] While Mother testified that she in fact saw Child subsequent to this through private arrangement with Child's foster mother, Child's foster mother disputed this claim. N.T., 4/1/21, at 28, 33-34, 43, 46-48. Mother, however, acknowledged that she had not seen Child since she moved to California in February 2020. *Id.* at 27-29.

Notably, when asked as to requests for visitation, Mother testified that she contacted Mr. Sargent to see what was necessary to regain custody, as well as attempts to contact her attorney. *Id.* at 27-29, 32. Mr. Sargent stated that Mother never made outreach as to visitation. *Id.* at 51.

[18] Mr. Sargent described showing Child a photograph of Mother and Child not knowing who was depicted in the photograph. N.T., 2/11/21, at 25-26.

her current home, where she was happy, as home, and indicated that Child wanted to remain with her foster mother. *Id.* at 56; *see also* Ms. Dooley Legal Counsel Report 1, at 2 ("She expressed her desire to remain with [her foster mother] and make this her forever home."). As such, Mr. Sargent opined that termination of Mother's parental rights would not result in irreparable harm to Child. He further indicated that his belief that it would be in Child's best interests to be freed for adoption. N.T., 2/11/21, at 27. Mr. Sargent explained:

> As I previously stated, [Child] does not know. She does not know her biological [m]other. She looks at [her foster mother] for everything.
>
> They're close. Like this is who she wakes up to, you know, every single day. And[,] so[,] terminating wouldn't cause any harm because it's almost like she's not aware of who her bi -- you know, her biological person -- her biological [m]other is.

*Id.* at 27-28.

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the conclusion of the hearings, Child had most recently been in placement for over two years and is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper

parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Based on the foregoing independent analysis of the trial court's termination of Mother's parental rights, we agree with counsel for Mother that the appeal from the decree terminating Mother's parental rights is wholly frivolous.[19]

Next, we turn to the question of whether the trial court appropriately changed the permanency goal to adoption. In so doing, our standard of review is the same abuse of discretion standard as noted above. ***See In the Interest of L.Z.***, 631 Pa. 343, 360, 111 A.3d 1164, 1174 (2015) (citing ***In re R.J.T.***, 608 Pa., 26-27, 9 A.3d at 1190)), for the proposition that the abuse of discretion standard applies in a dependency matter; ***see also In re S.B.***, 943 A.2d 973, 977 (Pa.Super. 2008) ("In cases involving a court's order changing the placement goal from "return home" to adoption, our standard of review is abuse of discretion.")

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the

---

[19] Further, we note that our independent review of the record did not reveal any additional, non-frivolous issues overlooked by counsel. ***See Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa.Super. 2015) (citing ***Commonwealth v. Goodwin***, 928 A.2d 287 (Pa.Super. 2007) (*en banc*)).

appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

Additionally, § 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

Given our disposition concerning termination, discussed *supra*, we would conclude that Mother's appeal from the goal change order is moot. *See In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa.Super. 2020) (citing *In re D.A.*, 801 A.2d 614, 616 (Pa.Super. 2002)) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees.").

- 23 -

Nevertheless, even if not moot, upon independent analysis, Mother's claim as to the goal change would likewise be frivolous and without merit. For the reasons we have already discussed throughout this memorandum, the record confirms that changing Child's goal to adoption is in her best interest. **See A.B.**, 19 A.3d at 1088-89.

For the foregoing reasons, we affirm the decree and order of the trial court, and grant Counsel's petition to withdraw.

Decree affirmed. Order affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2021